[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Craftsman Management, Inc., DBA Craftsman General Contractors, AKA Craftsman Painting (Craftsman), filed a two count complaint alleging breach of contract and unjust enrichment against the defendant, The Greens Condominium Association, Inc. (the Greens), seeking payment of $21,827.49 for painting and carpentry services rendered[1]
plus interest, costs, and attorney's fees.
The Greens filed an answer to Craftsman's complaint, asserting two special defenses, and a two count counterclaim on May 17, 1999. By way of special defense, the Greens alleges that Craftsman is barred recovery because of its failure to comply with the Home Improvement Act (HIA), General Statutes § 20-418 et seq.[2] In its two count counterclaim, the Greens alleges that the work performed by Craftsman was to the common elements of the Greens, making the HIA applicable to the Greens in the present case.[3] The Greens also alleges that Craftsman's failure to comply with the HIA results in a per se violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes §42-110b, entitling the Greens to damages in accordance with CUTPA. The second count of the Greens' counterclaim alleges that Craftsman performed its work in an unworkmanlike and negligent manner. The Greens also seeks damages for remedial work performed to remedy Craftsman's allegedly defective work.
Craftsman filed a reply to the Greens' special defenses on June 29, 2000, claiming that the special defenses are barred because the Greens acted in bad faith. Craftsman also filed an amended answer and two special defenses to the Greens' counterclaim on June 29, 2000. In its first special defense, Craftsman claims that the Greens' counterclaims are barred by the statute of limitations. In its second special defense, Craftsman claims that the counterclaims are barred because the Greens CT Page 10662 acted in bad faith.
This case was tried to the court on several non-consecutive days over several weeks. Both parties have submitted post-trial briefs to the court. The Greens has also submitted a reply brief to Craftsman's initial post-trial brief.
 Plaintiff Craftsman's Complaint
The Greens argues that the HIA applies to Craftsman because Craftsman is a contractor[4] and the Greens is a private residence[5] as defined by the HIA. The Greens further argues that the "contracts" offered by Craftsman as evidence of the Greens' debt are unenforceable under the provisions of the HIA because they fail to comply with the HIA's requirements.[6] The Greens asserts that missing from all and/or some of the "contracts" is the owner's signature, notice of the Greens' cancellation rights, and the absence of a starting and completion date thus making the "contracts" unenforceable against the Greens under the HIA.
Craftsman argues that it is not a contractor as defined by the HIA, but is rather a subcontractor; therefore, according to Meadows v. Higgins,249 Conn. 155, 733 A.2d 172 (1999), the HIA is inapplicable in the present case.
Our Supreme Court has held that the HIA does not apply to subcontractors. Id. 165. In Meadows the defendants entered into a written agreement with BCS, a construction company, whereby BCS would act as a consultant in the renovation of the defendants' home. Simon, a principal of BCS, acted as construction manager for the project. Simon's actions included contacting the plaintiff painting subcontractor, inviting the painter to submit a bid, conveying the bid to the defendants for approval, accepting the bid submitted by the painting subcontractor, telling the painter his start date, scheduling the work, accepting or rejecting the work, and communicating criticism of the work from the defendants to the painting subcontractor. Id. 168-69. The Supreme Court agreed with the attorney trial referee who found that "because Simon had performed most of the functions of a general contractor vis-a-vis the plaintiff, Simon had acted essentially as a general contractor and, therefore, the arrangement between the plaintiff and the defendants did not support the existence of an agreement between a contractor and an owner for the purposes of [General Statutes] § 20-419 (5)." (Internal quotation marks omitted.) Id. 169. The Meadows court also noted that although Simon was not obligated to perform any renovation work for the defendants and that the painting subcontractor received payment directly from the defendants, these factors did not "alter the relationship of CT Page 10663 subcontractor, general contractor and homeowners, as determined by the referee." (Internal quotation marks omitted.) Id. 171.
In the present case, testimony presented by the parties demonstrates that the Greens hired Preferred Management from 1989 to 1997 to manage its property. Peter Flynn, owner of Preferred Management, acted as property manager for the Greens. Flynn's actions, as they are pertinent in the present case, included contacting Craftsman, inviting Craftsman to submit bids for painting work needed at the Greens, conveying Craftsman's proposals to the Greens for approval, accepting the proposals submitted by Craftsman, telling Craftsman when to begin work, scheduling the work, providing all materials needed to complete Craftsman's work, supervising the quality of Craftsman's work, and communicating criticism of the work from the Greens to Craftsman.
Craftsman began doing business with the Greens, through its property manager, in 1991. The Greens never had a written contract with Craftsman for the painting services performed. Craftsman would submit its proposal to Flynn for the Greens' review. After receiving approval from the Greens, Flynn would normally inform Craftsman verbally that its offer for services had been accepted. Craftsman's proposals, as entered into evidence, are the memorialization of the agreements between Craftsman and the Greens for services. Traditionally, Craftsman would send Flynn an invoice for the painting services performed and the Greens would pay Craftsman for its work.[7] Craftsman's invoices were paid without dispute until 1997. In the summer of 1997, before Flynn terminated his services with the Greens, Flynn approved Craftsman's painting proposal for building #2 (Exhibit 8). Craftsman only received half of the payment for painting services completed on building #2.
Between July 1997, and October 1997, subsequent to Flynn's termination of the relationship between Preferred Management and the Greens, Patricia Groves, the president of the Greens' board, fulfilled the duties of property manager. Craftsman submitted two proposals to the Greens, one dated September 8, 1997, for the "replacement of damaged or rotten lumber on building #10" (Exhibit 10) and another dated October 13, 1997, for the painting of building #10 (Exhibit 9), which were accepted through the same method that Flynn had instituted in earlier dealings with Craftsman. Dan Ritchey was hired as property manager of the Greens in October 1997 and began fulfilling the duties formerly performed by Flynn as property manager. Craftsman finished the painting and carpentry work described in Exhibit 9 and 10 while Ritchey was property manager of the Greens.[8]
The Greens, however, has not paid Craftsman for this work.
The testimony of the parties and the "contracts" offered by Craftsman as evidence clearly demonstrate that Flynn acted as a general contractor CT Page 10664 for the Greens when he interacted with Craftsman. The evidence also demonstrates that Groves and Ritchey continued to act in the same capacity as Flynn after Flynn terminated the relationship between Preferred Management and the Greens.[9] From all of the evidence adduced at trial of the prior dealings between Flynn and Craftsman, this court finds that Craftsman is a subcontractor in the present case and that the HIA is inapplicable.[10] Accordingly, because Craftsman has not violated the HIA, violation of the HIA cannot act as a defense for failing to pay Craftsman for its services, and judgment enters for Craftsman on its complaint.
 Defendant The Greens' Counterclaim
The Greens alleges in the first count of its counterclaim that because Craftsman failed to comply with the HIA, that Craftsman per se violated the Connecticut Unfair Trade Practice Act (CUTPA), General Statutes § 42-110b. As discussed above, the HIA is inapplicable in the present case, and because the Greens' CUTPA claim is premised solely upon the Greens' argument that Craftsman violated the HIA, the first count of the Greens' counterclaim fails.
The Greens alleges in the second count of its counterclaim that Craftsman performed work in such an unskilled and negligent manner that much of the paint "blistered and peeled and was wholly unacceptable." At trial, the Greens argued buildings #2, #5, #9, #10, and #21 were affected by Craftsman's allegedly unworkmanlike and negligent performance. The defendant's counterclaim, however, may only claim negligence based upon the agreements which form the basis of this action, namely buildings #2 and #10. The Greens, through its property manager, has paid Craftsman without dispute for work performed on buildings #5, #9, and #21; therefore, this court will not consider evidence presented as to these buildings when determining whether Craftsman's work was unworkmanlike and negligently performed, since it was approved as satisfactory and paid for during Flynn's management previously discussed.
At trial, the Greens was unable to prove that the condition of the paint or rotting wood being left on the buildings is the result of Craftsman's work and not the result of the Greens' own actions. It is well accepted in the painting industry that paint should not be applied in temperatures below fifty degrees. In November of 1997, when painting building #10, Craftsman informed the Greens that if it was forced to paint in the below fifty degree weather, the paint might fail. Despite Craftsman's warnings to the Greens, the Greens ordered Craftsman to continue painting, regardless of the weather conditions, until one coat of paint was applied to the building. The Greens, therefore, assumed the risk of failing paint. CT Page 10665
Furthermore, Craftsman suggested to the Greens that if it wanted optimum results, that the Greens should switch to a different paint and a different method of paint application. Craftsman painted an exemplar wall, using the product and the brushing method suggested, to demonstrate the appearance of a final product if the Greens chose to take Craftsman's suggestions. While the Greens was satisfied with the results of the exemplar wall, in order to save money, the Greens opted to disregard Craftsman's suggestions. Instead, the Greens chose a paint that was higher in quality than the paint it had used in the past, but was of a lesser quality than the paint suggested by Craftsman. More importantly, the Greens opted to have Craftsman continue applying the paint through the spray method rather than the recommended brush method. Groves testified that the Greens is unsatisfied with Craftsman's work because it does not look like the exemplar wall. This evidence tends to show that the Greens "got what it paid for" but does not demonstrate that Craftsman performed its job in an unworkmanlike or negligent manner.
Additionally, when Craftsman had to stop painting building #10 due to the dropping temperatures of the season, the Greens made a punch list indicating what work on building #10 needed to be completed in the spring and also indicating areas of more immediate concern that the Greens wanted repaired. Craftsman did a walk around of building #10 with the property manager at the time, Ritchey, and then afterwards met with Groves to discuss the punch list. Craftsman agreed to come back the next day and repair to the Greens' satisfaction the items that were of concern to the Greens. After her meeting with Craftsman, Groves ordered Ritchey to send a fax to Craftsman instructing Craftsman not to come back to the Greens. If any of Craftsman's work was defective, the Greens denied Craftsman the opportunity to remedy the situation. The Greens did not allow Craftsman to complete the painting work on building #10.
While the Greens rely heavily on the testimony of Martin Benassi to establish that Craftsman's work was done in an unworkmanlike and negligent manner, Benassi is an architect and not a painting expert. In. fact, Benassi testified that he has limited experience with painting and clapboard siding, the siding that was used on all of the buildings at the Greens. The majority of Benassi's testimony related to rotting wood, not the quality of Craftsman's work. While it is true that Craftsman did help the Greens' employees by removing rotting wood according to its proposal for building #10 (Exhibit 10), no evidence was presented that demonstrates that it was Craftsman's failure to remove the rotting wood, and not the Greens' failure, which caused the rotting wood to remain on the buildings. In fact, Flynn, Ritchey, and Groves all testified that the removal of rotting wood from the buildings was the Greens' responsibility. The Greens has failed to prove that Craftsman performed CT Page 10666 its work in an unworkmanlike and negligent manner and therefore, the second count of the Greens' counterclaim must fail.[11]
Accordingly, for the foregoing reasons, judgment shall enter on the complaint in favor of the plaintiff, Craftsman in the amount of $21,827.49 plus interest and court costs. Attorney fees denied.[12]
Judgment shall enter on all counts of the counterclaim in favor of Craftsman, the counterclaim defendant.
Franks S. Meadow, Judge Trail Referee